UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

DEVRAJ PATEL,

    Plaintiff,

v.

VMWARE, INC.,

    Defendant.

Case No. 22–cv–05731–ESK–AMD

OPINION

**KIEL, U.S.D.J.**

    **IN THIS MATTER** plaintiff Devraj Patel claims that defendant VMware, Inc. failed to pay the full commission it owed him from a substantial sale when it unilaterally changed the terms of his compensation agreement in the midst of the process to close the sale. There are no material factual disputes. VMware provided notice of yearly changes to the commission structure, Patel agreed to those changes, and VMware exercised its express right to cap commissions for "Exceptional Transactions," which the sale at issue undisputably was. Accordingly, summary judgment in favor of VMware will be entered.

    **I.    BACKGROUND**

    Patel was employed at VMware as a client executive beginning in 2019. (ECF No. 66–2 (Pl.'s SOMF) ¶1; ECF No. 68–5 (Def.'s SOMF ¶4.)) VMware is an information technology company.[1] (Def.'s SOMF ¶1.) Patel sold VMware's products and services to state and local education clients in New Jersey and New York. (*Id.* ¶4.)

---

[1] VMware was acquired by Broadcom, Inc. in 2023 and is now known as VMware, LLC. (Def.'s SOMF ¶2.)

### A.    <u>Patel's Compensation Structure</u>

Patel received a base salary of $155,000 and received commission payments based on performance. (Pl.'s SOMF ¶3; Def.'s SOMF ¶¶5–9.) Performance was measured against goal sheets presented to employees twice a year. (Pl.'s SOMF ¶¶3, 7.) Goal sheets set forth "differing commission rates and commission tiers based on quota achievement, all tied to differing compensation targets." (Def.'s SOMF ¶14.) Once a new goal sheet is issued, the prior goal sheet is voided. (Pl.'s SOMF ¶11.)

Each goal sheet included uniform terms and conditions applicable to all employees eligible for commission compensation. (Def.'s SOMF ¶15.) Commissions would be paid only if the employee accepted the new goal sheet and its terms and conditions. (Pl.'s SOMF ¶11.) For each fiscal year,[2] Patel was emailed his goal sheets, which he electronically signed by clicking an electronic "accept" button. (Def.'s SOMF ¶¶16–18.) Patel, however, argues that he never read the goal sheet's terms and conditions because VMware provided insufficient time to do so. (ECF No.70–1 (Pl.'s Resp. to Def.'s SOMF) ¶18.)

The terms and conditions govern VMware's commission payments to its commission-eligible employees. (ECF No. 68–3 (Farkhrisaralan Decl.) ¶6.) The terms and conditions call commission-eligible employees "participants" and commissions "variable compensation." (*Id.* ¶6.) VMware updated the terms and conditions each fiscal year. (Pl.'s SOMF ¶¶5–8.) Section 1 of each fiscal year's terms and conditions contained a provision indicating that it superseded and replaced the prior fiscal year's terms and conditions. (ECF No. 66–3 pp. 117, 158, 188.)

---

[2] VMware's fiscal year begins in early February. (ECF No. 66–3 pp. 117, 158, 188.) Thus, fiscal year 2020 began on February 2, 2019, and ended on January 31, 2020. (*Id.* p. 117.)

2

Section 10 of the 2020 terms and conditions titled "Company Right to Modify" provided:

> **Exceptional Transaction**
>
> In addition to the Company's right to modify plans pursuant to Section 14.1, there are exceptional transactions that may not be treated in accordance with the typical Plan terms and rules, i.e. "Exceptional Transactions", and the Company reserves the right and sole discretion to make commission and crediting adjustments for such transactions. For such deals, credit is not guaranteed, and no draws will be paid against these designated transactions.
>
> The Company designates as "Exceptional" any deal considered an unanticipated or extraordinarily large credit event above planned performance expectations (quota) or those which generate abnormal expense burden. Illustrative Exceptional Transactions subject to review include but are not limited to the examples below:
>
> • **Disproportionate Quota Attainment:** Any single transaction value which exceeds more than 100% of the Participant's assigned Quota and/or was not carried in the Participant's assigned Quota
>
> • **Large Single Deals:** Any single opportunity with a bookings value greater than or equal to $10,000,000 USD
>
> \* \* \* \* \*
>
> **Exceptional Transaction Designation and Approval**
>
> VMware reserves the right to exclude credit for associates or teams without deal involvement and final treatment will be considered by sales role. Sales, Sales Operations, and Finance leadership will identify Exceptional Transactions as early as possible in the sales process for review and designation and will communicate any hold order/payment status to the affected Participant(s) during the review process.
>
> Final designated transactions and recommendations will be presented to the Sales Compensation Committee, for Level 1 approval, on a monthly, with credit and payment updates executed in the next feasible pay cycle post-approval.

(Def.'s SOMF ¶ 27.) Pursuant to the 2020 terms and conditions, VMware's "[s]ales, [s]ales [o]perations, and [f]inance leadership [would] identify Exceptional Transactions as early as possible in the sales process for review

3

and designation and will communicate any hold order/payment status to the affected Participant(s) during the review process." (*Id.*) The parties dispute the meaning of the term "sales process." Patel asserts that the "sales process begins when the salesperson first makes contact with a potential customer, if not earlier" and "ends when the salesperson receives a purchase order from the customer or the customer has signed an agreement to finance the purchase." (ECF No. 66–2 (Pl.'s Br.) p. 11.) VMware asserts the "sales process" begins when a customer sends a purchase order or signs an agreement.[3] (ECF No. 69–1 (Def.'s Resp. to Pl.'s SOMF) ¶ 20–21; ECF No. 68–1 (Def.'s Br.) p. 14.)

While the relevant terms and conditions stayed substantially the same for the relevant fiscal years, the underlined language below was added to the 2022 terms and conditions:

> Final designated transactions and recommendations will be presented to the Sales Compensation Committee for Level 1 approval, on a monthly basis, with Credit and payment updates executed in the next feasible pay cycle post-approval. <u>The Sales Compensation Committee may make Crediting and payment Adjustments for such transactions. Generally, for Exceptional Transactions, the maximum Credit for a single deal (which could include multiple orders to the same customer) is limited to 300% attainment for each metric in the Plan. Credit will not be granted for a value greater than the eligible Credit for the role.</u>

(ECF No. 66–3 p.199.)[4] Although the 2020 terms and conditions did not include the underlined language, VMware argues that it was permitted to modify commissions for "Exceptional Transactions." (Def.'s SOMF ¶ 58.)

---

[3] "Sales process" is not a defined term in the terms and conditions.

[4] For fiscal year 2021, the additional line reads: "The Sales Compensation Committee may make crediting and payment Adjustments for such transactions. Generally, for Exceptional Transactions, the maximum Credit for a single deal (which could include multiple orders to the same customer) is limited to 300% plan attainment." (ECF No. 66–3 p.170.)

4

VMware claims it had been applying a 300% cap to Exceptional Transactions "for several years." (Def.'s SOMF ¶ 59, Pl.'s Resp. to Def.'s SOMF ¶ 59.)[5]

All relevant years' terms and conditions state that commissions are "earned" after three conditions are met: (a) the employee accepted the goal sheet and terms and conditions; (b) the employee has "eligible Quota Achievement"; and (c) VMware completed its reconciliation of the transaction, which can include a review of "Exception[al] Transactions."[6] (Def.'s SOMF ¶ 26.)[7] A credit event for a given transaction does not occur until a purchase order or

---

[5] Although admitting this fact, Patel states that VMware "apparently has been imposing a 300% cap on commissions arising from [E]xceptional [T]ransactions for several years. However, there is no basis to do so under the [fiscal year 2020) Plan." (Pl.'s Resp. to Def.'s SOMF ¶ 59.)

[6] Section 6.1 of the Terms and Conditions provides:

> Variable Compensation payments are "Earned" by Participants only after all of the following have occurred:
>
> • The Participant Accepted his or her Goal Sheet.
>
> • The Participant has (1) eligible Quota Achievement for quota-retiring transactions; or (2) for non-quota retiring earning opportunities (for example, incremental incentives, SPIFs), all criteria for the opportunity have been met.
>
> • A Plan Reconciliation, including but not limited to the review of any transactions deemed to be Exception Transactions, splits, and other Adjustments, has been completed by VMware, analyzing all commissionable events, draws, Commissions paid, and factors affecting Variable Compensation. Plan Reconciliation occurs after the end of the Plan Period. As a result, to the extent VMware makes any payments for Variable Compensation before this Plan Reconciliation has been completed, such payments are preliminary advances for Variable Compensation that has not yet been earned and are subject to Adjustments until Plan Reconciliation.

(ECF No. 66–3 p. 124.)

[7] Although the term "Exception Transactions" appear in the terms and conditions, VMware, without explanation, assumes this was intended to mean "Exceptional Transactions." (Def.'s Br. p. 7.) Patel does not address this irregularity.

5

binding agreement for the purchase of VMware's products and/or services is signed. (*Id.* ¶ 45.)

### B. The Sale

Patel began working as the lead salesperson on a large potential sale to the New York City Department of Education ("DOE") around September 2019. (Pl.'s SOMF ¶¶ 27–28.) Since Patel spent a substantial portion of his time working on this deal, he closed fewer sales in fiscal years 2020 and 2021. (ECF No. 66–1 (Pl.'s Br.) p. 13.) One part of the sale to the DOE closed in August 2021 and the other closed in November or December 2021. (Pl.'s SOMF ¶¶ 30, 36.) The combined value of the sale was approximately $20,000,000. (*Id.* ¶ 29.)

### C. After Closing

In late October of 2021, VMware placed Patel's commissions from the first part of the sale on hold. (Pl.'s SOMF ¶ 31; Def.'s Resp. to Pl.'s SOMF ¶ 31.) Through October and November, Patel exchanged emails with several coworkers regarding the commissions from the DOE sale. (Pl.'s SOMF ¶ 32–35.) On December 8, 2021, VMware notified Patel that it determined the August 2021 sale to be an Exceptional Transaction. (*Id.* ¶ 37.) Thereafter, VMware applied the 300% cap to both parts of the sale, reducing Patel's credit by $4,100,000 for the first part and $4,500,000 to the second. (ECF No. 70–2 p. 233.) Patel received $539,685 in commissions but would have received $1,052,212 had VMware not applied the cap. (Pl.'s SOMF ¶¶ 40–41.)

### D. Procedural History

On August 19, 2022, Patel commenced this action in the Superior Court of New Jersey. (ECF No. 1 ¶ 1.) Patel asserts three counts against VMware: violations of the New Jersey Wage Payment Law (Count I), breach of contract (Count II), and breach of covenant of good faith and fair dealing (Count III).

(*Id.* pp. 15, 16.)  VMware removed the action on September 27, 2022, asserting diversity jurisdiction.  (ECF No. 1.)

On April 18, 2025, Patel and VMware filed motions for summary judgment.  (ECF No. 66; ECF No. 68.)  The parties filed responses in opposition to the opposing parties' motion.  (ECF No. 69; ECF No. 70.)  The parties also filed reply briefs.  (ECF No. 71; ECF No. 72.)

## II. LEGAL STANDARD

Under Rule 56(c), summary judgment is appropriate if the moving party demonstrates there are no genuine issues of material fact, and the materials in the record establish the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *see also* Fed. R. Civ. P. 56(c)(1)(A) (providing that "materials in the record" include depositions, documents, electronically stored information, affidavits or declarations, admissions, interrogatory answers, or "other" materials).  A factual dispute is "genuine" if a reasonable trier of fact could find in favor of the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if a dispute over that fact "might affect the outcome of the suit under the governing law."  *Id.*

## III. DISCUSSION

### A. Count I: NJWPL

The New Jersey Wage Payment Law (NJWPL) is a "remedial statute" that "governs the time and mode of payment of wages due to employees."  *Musker v. Suuchi, Inc.*, 331 A.3d 900, 905 (N.J. 2025) (quoting *Maia v. IEW Constr. Grp.*, 313 A.3d 887, 895 (N.J. 2024)).  The NJWPL has humanitarian purposes, and should be liberally construed.  *Hargrove v. Sleepy's, LLC*, 106 A.3d 449, 457 (N.J. 2015); *Kas Oriental Rugs, Inc. v. Ellman*, 972 A.2d 413, 429 (N.J. Super. 2009).  "If an employer violates the NJWPL, an employee may seek damages in a private cause of action."  *Musker*, 331 A.3d at 905.

The NJWPL defines "wages" to include amounts "determined" on a "commission basis." N.J.S.A. §34:11-4.1(c); *see also Musker*, 331 A.3d at 906. Though the NJWPL does not define commissions, it is "a fee paid to an agent or employee for transacting a piece of business or performing a service; esp[ecially]: a percentage of the money received from a total paid to the agent responsible for the business." *Musker*, 331 A.3d at 906. Supplementary incentives, or "compensation that motivates employees to do something above and beyond their 'labor or services'" are excluded from wages and not protected by the NJWPL. *Id.*

The NJWPL requires employers to notify "employees of any changes in the pay rates or pay days prior to the time of such changes." N.J.S.A. §34:11-4.6(b). While employers may change commission calculations, these changes can only be made "prospectively," "giving advance notice to any employee paid on a commission basis." *Winslow v. Corp. Exp., Inc.*, 834 A.2d 1037, 1044 (N.J. Super. Ct. App. Div. 2003); *Hargrove*, 106 A.3d at 457 (internal citations omitted).

Here, VMware did what the NJWPL requires. At the start of each fiscal year, VMware notified all "participants" of the commission structure that would be applied to "earned" commissions for the fiscal year. Each new goal sheet and terms and conditions expressly notified participants that the prior fiscal year's terms and conditions were "superseded and replaced." Accordingly, VMware did not retroactively change the rate of commissions that Patel was entitled to receive.

Patel argues that VMware violated the NJWPL by "changing the commission formula applicable to the sales [] Patel closed with the [] DOE over two years after he began working on the sale, and four months after he closed the sale." (Pl.'s Br. pp.7, 18.) When Patel began working on the potential DOE sale is, however, irrelevant because his commission is based on the

8

formula in effect at the time the commission is "earned." Under the unambiguous terms of each fiscal year's terms and conditions, Patel's commissions were earned only after a "Plan Reconciliation," which occurred at the end of each fiscal year.

Although Patel began working on the DOE sale in September 2019, during fiscal year 2020, the sales did not close until fiscal year 2022. Thus, the terms and conditions for fiscal year 2022 were in effect when the commissions for the DOE sale were "earned." Those terms and conditions contained a cap of "300% attainment." Fair notices of the implementation of the cap were provided with the fiscal year 2021 and 2022 terms and conditions. Patel agreed to those terms and conditions.

Accordingly, summary judgment will be entered in favor of VMware on Count I.

### B. Count II: Breach of Contract

A breach of contract claim requires that: (1) the parties entered into a contract containing certain terms; (2) the plaintiff performed as required while the defendant did not; and (3) the defendant's breach caused a loss for the plaintiff. *Goldfarb v. Solimine*, 245 A.3d 570, 577 (N.J. 2021). Compensation plans agreed to by the parties are enforceable contracts under New Jersey law. *Nolan*, 579 A.2d at 1257.

Patel points to VMware's obligation to "identify Exceptional Transactions as early as possible in the sales process for review and designation." Patel argues that VMware breached the terms and conditions by failing to timely advise him—i.e. "as soon as possible"—that the potential sale to the DOE might be considered an Exceptional Transaction. (Pl.'s Br. p. 21.) But VMware was not required to again notify Patel that a large, potential sale would be considered an Exceptional Transaction. Section 10 of each of the terms and conditions for fiscal years 2020, 2021, and 2022 notify participants that "[a]ny

9

single transaction with a booking value greater than or equal to $10,000,000" would be treated as an Exceptional Transaction. (ECF No. 66–3 pp. 129, 170, 199.) Each fiscal year's terms and conditions also notified participants that "[a]ny single transaction value which exceeds more than 100% of the [p]articipant's assigned Quota and/or was not carried in the [p]articipant's assigned Quota would be treated as an Exceptional Transaction." (*Id.*) No dispute exists that the sale to the DOE exceeded 100% of Patel's quota and the sale to the DOE was anticipated to be over $10,000,000. Accordingly, Patel was already on notice, through each year's terms and conditions, that the potential sale to the DOE would be an Exceptional Transaction. VMware's not further notifying Patel during the "sales process" is of no moment.

Accordingly, summary judgment will be entered in favor of VMware on Count II.

### C. Count III: Breach of the Implied Covenant of Good Faith and Fair Dealing

"The implied covenant of good faith and fair dealing is a 'component of every contract that requires both parties to a contract act in good faith[,]' that is, they must 'adher[e] to community standards of decency, fairness, or reasonableness.'" *Marshall v. Verde Energy USA. Inc.*, No. 18-1344, 2019 WL 1254562, at *5 (D.N.J. Mar. 19, 2019) (alterations in original) (quoting *Iliadis v. Wal-Mart Stores, Inc.*, 922 A.2d 710, 722 (N.J. 2007)).

"However, '[t]he implied duty of good faith and fair dealing does not operate to alter the clear terms of an agreement and may not be invoked to preclude a party from exercising its express rights under such an agreement.'" *Axletree Solutions, Inc. v. IntellectEU, Inc.*, No. 24–11431, 2025 WL 583271, at * 6 (D.N.J. Feb. 24, 2025) (quoting *Fleming Cos., Inc. v. Thriftway Medford Lakes, Inc.*, 913 F. Supp. 837, 846 (D.N.J. 1995)). "Where the terms of a contract are not specific, the implied covenant of good faith and fair dealing may

fill in the gaps where necessary to give efficacy to the contract as written." *Id.* "But where the terms of the parties' contract are clear, the implied covenant of good faith and fair dealing will not override the contract's express language." *Id.* (quoting *Fields v. Thompson Printing Co.*, 363 F.3d 259, 272 (3d Cir. 2004)).

Patel argues that VMware's reliance on the terms and conditions to reduce Patel's commissions violates the covenant of good faith and fair dealing. (Pl.'s Br. p. 25.)  Patel cites to *Nolan v. Control Data Corp.*, where the Court found a sales plan likely did not confer "the absolute, unfettered discretion to amend its compensation scheme retroactively at any time and for any reason whatsoever."  579 A.2d 1252, 1258 (N.J. Super. App. Div. 1990)).  In *Nolan*, the employee's quota was changed five different times over the course of one year.  *Id.* at 1255.  The facts of *Nolan* differ from the facts here.  The terms and conditions which Patel agreed to each fiscal year expressly provided VMware with the right to designate Exceptional Transactions and to cap commissions for such transactions.  And they explicitly stated that a transaction exceeding 100% of Patel's quota would be treated as an Exceptional Transaction.  The same terms and conditions contained a cap of "300% attainment."

VMware acted within the scope of its express rights.  Patel's implied covenant claim cannot survive.  Accordingly, summary judgment will be entered in favor of VMware on Count III.

## IV. CONCLUSION

For the foregoing reasons, VMware's motion (ECF No. 68) will be **GRANTED**. Patel's motion (ECF No. 66) will be **DENIED**. An appropriate order and judgment accompanies this opinion.

                                               */s/ Edward S. Kiel*
                                               **EDWARD S. KIEL**
                                               **UNITED STATES DISTRICT JUDGE**

Dated:   February 4, 2026